**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

PAUL REYNA OLVERA,                  §
                                    §
            Plaintiff,              §
                                    §
v.                                  §        CIVIL ACTION NO.  4:14-CV-00605-CAN
                                    §
CAROLYN W. COLVIN, ACTING           §
COMMISSIONER OF SOCIAL              §
SECURITY,                           §
                                    §
            Defendant.              §

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this appeal under 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security ("Commissioner") denying his claim for social

security insurance benefits [Dkts. 1; 13].  After reviewing the Briefs submitted by the Parties, as

well as the evidence contained in the Administrative Record, the Court finds that the

Commissioner's decision should be **AFFIRMED**.

## BACKGROUND

## I.        PROCEDURAL HISTORY OF THE CASE

On February 28, 2012, Paul Reyna Olvera ("Plaintiff") filed his application for

supplemental security income ("SSI") benefits under Title XVI of the Social Security Act

("Act"), alleging an onset of disability date of February 23, 2012 [TR at 200].  Plaintiff's

application was initially denied by notice on April 10, 2012, and again upon reconsideration on

May 16, 2012, after which Plaintiff requested a hearing before an administrative law judge

("ALJ").  *Id*. at 60, 73, 76-78.  The ALJ conducted a hearing on June 13, 2013 ("Hearing"), and

heard testimony from Plaintiff and Vocational Expert Sugi Kamarov ("Ms. Kamarov").

*Id.* at 27-28.[1]  Plaintiff was represented by counsel at Hearing.  *Id.*  On July 12, 2013, the ALJ issued his decision denying benefits, and found Plaintiff not disabled at step four of the prescribed sequential evaluation process (discussed *infra*).  *Id.* at 9-16.  On July 24, 2013, Plaintiff requested that the Appeals Council review the ALJ's decision, and on July 25, 2014, the Appeals Council denied Plaintiff's request for review, making the decision of the ALJ the final decision of the Commissioner.  *Id.* at 1-5, 26, 27-28.

On September 18, 2014, Plaintiff filed his Complaint with this Court [Dkt. 1].  Plaintiff filed his Brief on June 10, 2015 [Dkt. 13].  On June 23, 2015, this case was assigned to the undersigned by consent of all Parties for further proceedings and entry of judgment [Dkt. 15].  On August 7, 2015, the Commissioner filed her Brief in Support of the Commissioner's Decision [Dkt. 16], and on August 11, 2015, the Administrative Record was received from the Social Security Administration ("SSA") [Dkt. 17].

## II.    STATEMENT OF RELEVANT FACTS

### 1.    *Age, Education, and Work Experience*

Plaintiff was born on May 16, 1970, making him forty-three years of age at the time of the Commissioner's final decision [TR at 200].  Plaintiff completed the seventh grade.  *Id.* at 242.  Plaintiff's past relevant work experience includes a wire drawing machine tender, food production helper, fry cook, janitor, kitchen helper, and air-conditioning installer-servicer helper, window unit.  *Id.* at 218-25.  Plaintiff asserts that his onset date of disability is February 23, 2012.  *Id.* at 200.  Plaintiff has a criminal history, and has been incarcerated several times for drug-related offenses.  *Id.* at 31-32, 279.

---

[1] The Court notes the hearing transcript refers to the vocational expert as "Judy Conwell," the phonetical spelling of the expert's name, while the ALJ's opinion, the hearing notices, and the vocational expert resume all refer to the vocational expert as "Sugi Y. Kamarov" [TR at 9, 28-29, 179].  There is no dispute amongst the Parties that the same individual is referenced [*see* Dkts. 13; 16].  The Court herein refers to the vocational expert as "Ms. Kamarov."

## 2. *Plaintiff's Functional Reports*

Plaintiff completed Functional Reports on each of March 21, 2012 and May 1, 2012 [TR at 226-32, 257-64]. Plaintiff's March Report reflects Plaintiff's complaints of frequent leg and hand pain and numbness causing difficulties with dressing, standing for long periods of time, sleep, and some personal care activities. *Id*. at 226-32. Plaintiff therein further indicates that he can maintain his own personal hygiene, completes household chores such as gardening when he is able, drives a vehicle occasionally, prepares some meals such as TV dinners and sandwiches, is able to go to the grocery store, and socializes with friends via telephone. *Id*. Plaintiff also indicated that his medications cause fatigue and dizziness and that he has mood swings, panic attacks, anxiety, flashbacks, and difficulties dealing with stress. *Id*.[2] Plaintiff's May Report reflects similar symptoms and activities. *Id*. at 257-64.

## 3. *Medical Record Evidence*

Plaintiff's proffered medical records consist of reports from three different facilities: (1) Medical Center of McKinney ("MCMK" or collectively the "MCMK Records"); (2) Correctional Healthcare Management ("CHM" or collectively the "CHM Records"); and (3) PrimaCare Medical Centers ("PrimaCare" or the collectively the "PrimaCare Records") [TR 282-356]. The Administrative Record also contains two State Agency Assessments performed by Dr. Betty Santiago ("Dr. Santiago") and Dr. Frederick Cremona ("Dr. Cremona"). *Id*. at 302-05.

---

[2] The SSA considered Plaintiff's reports of mental health symptoms but found that further investigation was not warranted [TR at 265]. The Report of Contact stated that Plaintiff had no psychological history, no medical records reflecting mental health issues, no psychotropic medication prescriptions, and the field officer reported no problems with Plaintiff's understanding, concentrating, talking or answering. *Id*.

### (a) MCMK Records

On April 23, 2006, Plaintiff was treated at MCMK. *Id*. at 341-45. The MCMK Records reflect that Plaintiff's outer extremities (feet, legs, hands, arms) were examined and found to have normal range of motion ("ROM") and no pedal edema (accumulation of fluid in the feet and lower legs). *Id*.

### (b) CHM Records

Records from CHM are also provided [TR at 283-89]. The earliest record, dated August 4, 2010, indicates that Plaintiff had been diagnosed with diabetes mellitus type II approximately eighteen years prior and prescribed a diabetic diet. *Id*. at 283-84. It was further noted on August 4, 2010, that Plaintiff was non-compliant with his diabetes medication and the foot exam performed reflected Plaintiff had "no edema. 2+ pedal pulses. [f]ull sensation." *Id*. Plaintiff also reportedly stated at that time that he had last seen a physician two years ago and did not feel he needed medication for his diabetes. *Id*. Subsequent CHM Records reflect two lab test refusals and appointment refusals on August 5, 2010, February 6, 2011, and May 5, 2011 respectively. *Id*. at 285-86, 288. CHM Records from February 21, 2011 and May 25, 2011 further reflect treatment for bilateral chronic otitis externa (inflammation of the ear) with ear pain, and that Plaintiff received antibiotic treatment and multiple surgeries for such condition in the past. *Id*. at 287, 289.

### (c) PrimaCare Records

The PrimaCare Records generally reflect a diagnosis of diabetes mellitus type II, peripheral autonomic neuropathy, and elevated blood pressure reading without diagnosis of hypertension, and also reflect Plaintiff's subjective symptom reports of numbness, pain, and tingling in his legs, feet, and hands [TR at 291, 296-301, 309-14, 318-19, 347-53]. More

specifically, on February 2, 2012, Plaintiff was seen for an initial diabetes treatment appointment. *Id*. at 291, 296-301. Plaintiff reported being out of medication for over one year. *Id*. A foot exam was performed on February 2, 2012, with normal results including 2+ pulses and normal sensory function. *Id*. The PrimaCare Records also include prescriptions for several diabetes medications and a glucometer and patient reports of numbness and tingling in both legs. *Id*.[3] On May 24, 2012, Plaintiff was seen for a follow up appointment for diabetes, leg pain, hand numbness, excessive thirst, and increased hunger. *Id*. at 309-14. At the May 24, 2012 appointment, Plaintiff reported he had run out of medication at the end of March. *Id*. The May 24, 2012 PrimaCare Records indicate Plaintiff complains of numbness of his hands and legs, but the physician noted "good pedal pulses 2+" and skin ulcers, and that the physician advised Plaintiff to maintain medication compliance and see an endocrinologist. *Id*. The May 24, 2012 PrimaCare Records further state that Plaintiff's "[diabetes mellitus] was controlled with insulin." *Id*. Subsequently, on January 4, 2013, Plaintiff was seen for the flu with reported cerumen (excess ear wax) and TM erythema (bulging of the ear drum). *Id*. at 318-19. On February 25, 2013, the PrimaCare Records state that Plaintiff presented with symptoms of numbness and pain in the legs and feet; the provider reported ulcers and scales on the feet and, under diagnosis listed "Personal History of Noncompliance with Medical Treatment. Presenting Hazards to Health." *Id*. at 352-53. Finally, on April 30, 2013, the PrimaCare Records reflect that Plaintiff was treated for ear pain and fatigue, including an ear rash. *Id*. at 347-51. The April 30, 2013 PrimaCare Records also state that Plaintiff reported he could not afford insulin and had finished his supply over ten days beforehand. *Id*.

---

[3] The record also reflects one "Return Memo" completed February 2, 2012 stating that Plaintiff was seen by a PrimaCare Provider and could return to work the same day [TR at 298]. February 2, 2012 was the date of Plaintiff's first appointment with PrimaCare during which he was prescribed two diabetes medications. *Id*. at 291, 296-301.

### (d)    State Agency Assessments

In addition, as part of the SSI evaluation process, Dr. Santiago and Dr. Cremona each completed a case assessment based on their review of Plaintiff's medical records ("State Agency Assessments") [TR at 302-05].    Dr. Santiago noted medically determinable impairments of diabetes mellitus (DM) and peripheral neuropathy, but found them to be non-severe.    *Id*. at 302.    Dr. Santiago's assessment specifically referenced the February 12, 2012 PrimaCare Records which indicated that Plaintiff's foot and neurological exam and sensory examination were normal, and further commented that the field office claims representative had reported Plaintiff presented no physical difficulties during the interview.    *Id*. Dr. Santiago concluded that Plaintiff's alleged subjective symptoms were not supported by the medical expert record.    *Id*.    Dr. Cremona's assessment, performed on May 15, 2012, indicated that no new allegations or treatment had occurred since Dr. Santiago's assessment.    *Id*. at 304. Dr. Cremona noted that a field officer met with Plaintiff on April 8, 2012, and again noted no physical impairments.    *Id*.    Dr. Cremona found there was no indication of functional decline warranting changes to the prior functional assessment.    *Id*.[4]

### 4.    Hearing Testimony

### a.    Plaintiff's Testimony

At Hearing before the ALJ on June 13, 2013, Plaintiff testified that he was married at 14 years old and had been in and out of prison from approximately 1996 to 2007 [sic] for drugs [TR at 30-34].    Plaintiff reported living with his sister, who performs most of the cleaning and household chores.    *Id*. at 33-34, 45-47.    Plaintiff testified that he was terminated from several

---

[4] The MCMK Records, CHM Records, PrimaCare Records, and State Agency Assessments do not contain notations reflecting Plaintiff's inability to stand, walk, grip/handle objects, or handle job related tasks other than as expressly referenced.    *See generally id*. at 282-356.    The medical records are similarly devoid of any references to special diagnostic testing or specific treatment for peripheral neuropathy by MCMK, CHM, PrimaCare, or other medical providers during the relevant time period.    *Id*.

previous positions, including as a cook at Kentucky Fried Chicken and as a warehouse worker, for missing too much work due to alleged leg numbness. *Id*. at 35-43. Plaintiff testified he has been unable to afford treatment for his diabetes due to his erratic work history and criminal convictions, and has only seen a doctor once in a while. *Id*. Plaintiff further testified that he experiences leg numbness such that he cannot stand longer than ten minutes at a time, everything he holds in his hands he ends up dropping, and he has anger and other mental problems for which he has not sought treatment. *Id*. at 35-48. Additionally, Plaintiff explained that he has a chronic infection of the left ear, and that his diabetes medications cause fatigue. *Id*. Plaintiff reported that extreme heat aggravates his symptoms. *Id*.

### b. *Vocational Expert Testimony*

Ms. Kamarov testified as a vocational expert at Hearing [TR at 49-53]. The ALJ asked Ms. Kamarov to describe Plaintiff's work history, which she classified into six positions: (1) wire drawing machine tender (medium, but as performed light exertion; semi-skilled; specific vocational preparation ("SVP") of 3); (2) food production helper (medium, but as performed light exertion; unskilled; SVP of 2); (3) janitor (heavy; unskilled; SVP of 2); (4) fry cook (medium; unskilled; SVP of 2); (5) kitchen helper (medium; SVP of 2); and (6) air-conditioning installer-servicer helper, window unit (heavy, but as performed light exertion; semi-skilled; SVP of 3). *Id*.[5] Ms. Kamarov specifically noted that Plaintiff performed the work of air-conditioning installer-servicer helper, window unit and food production helper at a light

---

[5] SVP is defined in the Dictionary of Occupational Titles ("DOT") as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT, Appendix C, page 1009 (4th ed. 1991). Using the skill level definitions in 20 C.F.R. § 404.1568 and § 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT. Social Security Ruling 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000). The Court notes that the full DOT occupational title for 637.687-010 is air-conditioning installer-servicer helper, window unit, and the Court will refer to it herein by the full occupational title. 637.687-010 AIR-CONDITIONING INSTALLER-SERVICER HELPER, WINDOW UNIT, DICOT 637.687-010.

exertion level based on Plaintiff's work reports, rather than the standard DOT definition level of medium exertion. *Id.*[6] The ALJ then asked Ms. Kamarov a hypothetical question incorporating Plaintiff's age, work history, and education, and asked Ms. Kamarov to assume the hypothetical individual must avoid extreme temperatures. *Id.* The ALJ asked Ms. Kamarov if the hypothetical individual could perform Plaintiff's past relevant work, and Ms. Kamarov answered affirmatively that Plaintiff could perform Plaintiff's past work as an air-conditioning installer-servicer helper, window unit as he performed. *Id.* Ms. Kamarov also answered affirmatively that there are other jobs that exist in the national economy that the hypothetical individual could perform including: (1) buffing-machine tender (light, SVP of 2); (2) garment sorter (light, SVP of 2); and (3) photocopying-machine operator (light, SVP of 2), but that such jobs would allow only one or fewer absences per month. *Id.* Plaintiff's attorney also examined Ms. Kamarov, asking a series of hypothetical questions which incorporated additional limitations: (1) limited gross and fine manipulation; (2) only stand for 2 hours at a time with a thirty minute sitting break before resuming standing; and (3) unpredictable sitting breaks. *Id.* In response, Ms. Kamarov stated that furniture rental clerk (light, SVP of 2) and host/hostess (light, SVP of 2) would be available with limitation (1), and would be available with a sit/stand option for limitations (1) and (2). *Id.* However, Ms. Kamarov stated no jobs would be available in the national economy with all three limitations present. *Id.*

## III. FINDINGS OF THE ALJ

### 1. *Sequential Evaluation Process*

Pursuant to the statutory provisions governing disability determinations, the Commissioner has promulgated regulations that establish a five-step process to determine

---

[6] Step four of the sequential analysis requires that the ALJ analysis whether, given Plaintiff's residual functional capacity, Plaintiff can perform his past work either as it was performed by Plaintiff or as it is generally performed in the national economy (based on the DOT). 20 C.F.R. § 404.1560

whether a claimant suffers from a disability. 20 C.F.R. § 404.1520. First, a claimant who is engaged in substantial gainful employment at the time of his disability claim is not disabled. 20 C.F.R. § 404.1520(b). Second, the claimant is not disabled if his alleged impairment is not severe, without consideration of his residual functional capacity, age, education, or work experience. 20 C.F.R. § 404.1520(c). Third, if the alleged impairment is severe, the claimant is considered disabled if his impairment corresponds to a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). Fourth, a claimant with a severe impairment that does not correspond to a listed impairment is not considered to be disabled if he is capable of performing his past work. 20 C.F.R. § 404.1520(e). Finally, a claimant who cannot return to his past work is not disabled if he has the residual functional capacity to engage in work available in the national economy. 20 C.F.R. § 404.1520(f). Under the first four steps of the analysis, the burden lies with the claimant to prove disability and at the last step the burden shifts to the Commissioner. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). If at any step the Commissioner finds that the claimant is or is not disabled, the inquiry terminates. *Id.*

### 2. *ALJ's Disability Determination*

After hearing testimony and conducting a review of the facts of Plaintiff's case, the ALJ made the following sequential evaluation. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 28, 2012, the application date, and any work done after that date was not performed at a substantial gainful activity level [TR at 11]. At step two, the ALJ determined that Plaintiff had the severe impairments of diabetes and peripheral neuropathy, and such impairments were medically determinable. *Id.*[7] At step three,

---

[7] The ALJ references medical reports reflecting treatment for ear infections and skin ulcers, but ultimately did not find Plaintiff's ear infections or ulcers to be severe impairments under step 2 of the sequential analysis [TR 9-16]. Plaintiff does not challenge those findings on appeal, and the Court therefore does not address (or disturb) them [Dkt. 13].

the ALJ found that these impairments, or combination of impairments, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. at 11-12.  At step four, the ALJ found that Plaintiff had the residual functional capacity to perform light work with the limitation that Plaintiff avoid extreme temperatures. *Id*. at 12.[8]  At all times from February 28, 2012 to the date of the ALJ's decision, the ALJ found that Plaintiff retained the residual functional capacity to lift and/or carry 20 pounds occasionally, lift and/or carry 10 pounds frequently, stand/walk for 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday.  *Id*. at 12-16.  Continuing the step four analysis, the ALJ then determined that Plaintiff was able to perform his past relevant work as an air conditioner installer helper [sic] (as performed by Plaintiff).  *Id*. at 12-16.[9]  The ALJ, in the alternative, made findings at step five that Plaintiff's residual functional capacity allowed him to perform a range of light work in the national economy, including as a buffing[-]machine-tender, garment sorter, or photocopy[ing-]machine operator.  *Id*.  Based on this determination, the ALJ concluded Plaintiff was not disabled from February 28, 2012 to July 12, 2013.  *Id*.

---

[8] Each of the job classifications in the national economy is broken down into an exertion level: Sedentary, Light, Medium, Heavy, and Very Heavy.  20 C.F.R. § 404.1567.  Sedentary, Light, and Heavy work are defined as follows:

(a) Sedentary work.  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) Light work.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

d) Heavy work. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

[9] *See supra* note 5.

## STANDARD OF REVIEW

In an appeal under § 405(g), this Court must review the Commissioner's decision to determine whether there is substantial evidence in the record to support the Commissioner's factual findings and whether the Commissioner applied the proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). This Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner. *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1995). Additionally, any conflicts in the evidence, including the medical evidence, are resolved by the ALJ, not the reviewing court. *Carry v. Heckler*, 750 F.2d 479, 484 (5th Cir. 1985).

The legal standard for determining disability under Titles II and XVI of the Act is whether the claimant is unable to perform substantial gainful activity for at least twelve months because of a medically determinable impairment. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see also Cook*, 750 F.2d at 393. "Substantial gainful activity" is determined by a five-step sequential evaluation process, as described above. 20 C.F.R. § 404.1520(a)(4).

## ANALYSIS

Plaintiff raises one issue upon appeal: whether the ALJ's finding regarding residual functional capacity is supported by substantial evidence [Dkt. 13].[10]

At step four of the sequential analysis, the ALJ found that Plaintiff had residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b) in that he can lift and/or carry 20 pounds occasionally, lift and/or carry 10 pounds frequently, stand/walk for

---

[10] Plaintiff's brief and complaint imply that legal errors were also made, but Plaintiff fails to identify any specific legal errors [Dkts. 1; 13]. The Court therefore finds that Plaintiff's brief raises one issue: was the ALJ's determination with respect to residual functional capacity supported by substantial evidence. *Id.*

6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday [TR 12-16]. The ALJ further found Plaintiff should limit exposure to extreme temperatures. *Id*. Plaintiff argues that the ALJ did not take all of his limitations into account, and specifically failed to include his standing, walking, gripping, and handling limitations in the residual functional capacity finding [Dkt. 13 at 2-5]. For these reasons, Plaintiff asserts, the ALJ erroneously found that Plaintiff would be able to perform his past work as an air-conditioning installer-servicer helper, window unit. *Id*. The Commissioner argues, to the contrary, that the ALJ's residual functional capacity determination is supported by substantial medical evidence, and reflects that the ALJ properly weighed all relevant evidence, including Plaintiff's testimony which the ALJ found, in part, to not be credible [Dkt. 16 at 4-10].

A finding of no substantial evidence is appropriate only when no credible evidentiary choices or medical findings exist to support the decision. *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It must do more than create a suspicion of the existence of the fact to be established, but no substantial evidence will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Id*. (citing *Hemphill v. Weinberger,* 483 F.2d 1137 (5th Cir. 1973) and *Payne v. Weinberger,* 480 F.2d 1006 (5th Cir. 1973) (finding substantial evidence did not support the conclusion that plaintiff was not disabled where all evidence on the records reflected that plaintiff was disabled and no evidence on the record contradicted it)); *see also Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (finding that reports of four doctors that plaintiff was not disabled versus one report stating he was disabled was substantial evidence); *Williams v. Comm'r of Soc. Sec. Admin.*, No. 4:11-CV-00373,

2013 WL 1282460, at *3 (E.D. Tex. Mar. 27, 2013). Plaintiff has the burden at step four of the analysis. *Leggett*, 67 F.3d at 564.

## I. PLAINTIFF'S CREDIBILITY

As an initial matter, the Court considers Plaintiff's argument that the ALJ did not take each of Plaintiff's alleged limitations into account [Dkt. 13 at 4-6]. The record reflects the ALJ considered Plaintiff's complaints of pain, numbness, and difficulties with standing for long periods, and ultimately found Plaintiff's subjective complaints regarding these limitations to not be credible and/or to be self-serving to the extent they are not compatible with the objective medical evidence in the record [TR at 12-16].

As part of the five-step sequential evaluation process, the ALJ acts as fact finder considering both objective evidence, such as medical records, and subjective evidence, such as a claimant's allegations regarding symptoms and pain. *Salgado v. Astrue*, 271 F. App'x 456, 458 (5th Cir. 2008); *see also Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991). In evaluating the claimant's subjective evidence and credibility, the ALJ is required to follow a two-step process. *See Salgado,* 271 F. App'x at 458; *see also Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7P (S.S.A. July 2, 1996). First, the ALJ must determine whether there is an impairment that reasonably produces the symptoms of which the claimant complains. *Salgado,* 271 F. App'x at 458; *see also Stevenson v. Colvin*, No. 1:11-cv-168, 2013 WL 1181456, at *3-4 (E.D. Tex. Mar. 20, 2013). If the ALJ finds no impairment, the claimant is not disabled. *Salgado,* 271 F. App'x at 458. If the ALJ identifies an impairment, the ALJ then considers the claimant's statements regarding his or her symptoms and the remaining evidence in the record to determine the strength of the symptoms and how the symptoms affect the claimant's ability to do

basic work. *Stevenson*, 2013 WL 1181456, at *3. Furthermore, the ALJ must consider the claimant's subjective complaints and allegations regarding his or her capacity to do work, but may find that those complaints are not credible or are exaggerated in light of the medical evidence. *See Wilson*, 2014 WL 5343200, at *7.

The law requires that when an ALJ finds a claimant/plaintiff to be non-credible, the ALJ must articulate reasons for such determination. *Abshire v. Bowen*, 848 F.2d 638, 642 (5th Cir. 1988). To that end, the regulations provide a list of non-exclusive factors to be considered by the ALJ in evaluating the credibility of an individual's subjective complaints: (1) the plaintiff's daily activities; (2) the location, duration, frequency, and intensity of the pain and other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain and other symptoms; (6) any other measures, other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the plaintiff's functional limitations and restrictions due to pain and other symptoms. 20 C.F.R. § 416.929(c)(3). An ALJ need not articulate a finding as to each factor; it is sufficient to state that the factors were considered. *Prince v. Barnhart*, 418 F. Supp. 2d 863, 871 (E.D. Tex. 2005). In addition, while not an express factor, the ALJ may consider compliance or lackthereof with prescribed treatment. *Griego*, 940 F.2d at 945; *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) (finding lack of treatment may be considered as an indication of non-disability); *Johnson*, 864 F.2d at 348. The ALJ is also not bound to accept a plaintiff's self-serving statements, standing alone, as true; and the ALJ's determination with respect to a plaintiff's credibility is entitled to substantial deference by this Court. *Johnson*, 864 F.2d at 347 (citing *James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986))

(finding ALJ's determination regarding plaintiff's credibility and subjective statements regarding his pain symptoms is entitled to substantial deference, including where medical evidence does not support plaintiff's allegations of pain); *Teague v. Astrue*, No. 4:07-CV-773-A, 2008 WL 5101717, at *3 (N.D. Tex. Dec. 1, 2008), *aff'd*, 342 F. App'x 962 (5th Cir. 2009) (finding the ALJ considered plaintiff's testimony regarding her self-described functional limitations, but rejecting such limitations based on the medical evidence which showed "an absence of objective factors indicating the existence of severe pain, such as limitations in the range of motion, muscular atrophy, weight loss…." ); *Steimer v. Gardner*, 395 F.2d 197, 198 (9th Cir. 1968) (finding the SSA not bound to accept Plaintiff's self-serving statements regarding her disability onset date as true where " the record is almost totally devoid of medical testimony that would bring [plaintiffs] case within the statute" by showing her disabilities existed prior to her date last insured).

Here, the ALJ made specific findings that Plaintiff had the impairments of diabetes and peripheral neuropathy, but found that Plaintiff's symptoms were less severe than indicated by his testimony and not supported by the objective medical records [TR at 11-16].  Importantly, the ALJ did not find Plaintiff's testimony to be wholly not credible, but rather not credible to the extent it was unsubstantiated by the medical evidence [*see* TR at 12-16]. *Teague*, 2008 WL 5101717, at *3 (finding ALJ could find plaintiff's pain allegations and limitations to be non-credible where there was "an absence of objective factors indicating the existence of severe pain").  The ALJ referenced the required credibility factors, and made findings that portions of Plaintiff's testimony were not credible because: (1) Plaintiff's daily activities, including maintaining his own personal hygiene, helping with yard work, going shopping, and driving a vehicle were inconsistent with Plaintiff's described severity of

symptoms; (2) Plaintiff's diabetes appeared to be readily controlled with medication; (3) Plaintiff never sought treatment from a physician specialist or ongoing medical care consistent with his reported symptom severity, nor did Plaintiff's treating physicians order anything but routine, conservative treatment for diabetes; (4) the medical records reflected no evidence of recurrent hospitalization or emergent treatment for naturally occurring complications of diabetes or peripheral neuropathy, except complications after non-compliance with medical treatment; (5) there was significant evidence of non-compliance with medical treatment for Plaintiff's conditions, including emergent treatment for naturally occurring complications of Plaintiff's untreated conditions, such as ulcers; and (6) Plaintiff had limited treatment for his impairments, with significant gaps in treatment and medical appointments [TR 13-14]  The ALJ also noted that the State Agency Assessments, although of lesser probative value, were consistent with the ALJ's residual functional capacity and credibility determinations.  *Id.*  The ALJ went on to find that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his symptoms] are not credible to the extent they are inconsistent with the residual functional capacity assessment [listed above]."  *Id.*

Upon review of the ALJ's determination and the record, the Court finds that the ALJ conducted a detailed factual analysis, weighing Plaintiff's testimony regarding his impairments with the medical evidence in the record, and made findings under SSR 96-7P and the factors set forth in 20 C.F.R. § 416.929(c)(3).  The ALJ's credibility determination was not merely conclusory, and is supported by the record before the ALJ.  The ALJ thus appropriately declined to incorporate Plaintiff's claimed limitations because he properly found Plaintiff's statements to not be credible.

## II.    SUBSTANTIAL EVIDENCE

In addition, the Court now turns to the remaining record evidence.  Again, Plaintiff has provided no evidence, besides his own testimony, to substantiate the limitations related to peripheral neuropathy [*see generally* TR at 30-48, 282-356].  The medical evidence in the record reflects normal hand and foot function (discussed *infra*).  Further, Plaintiff has not shown that he could not perform the duties of his past position as an air-conditioning installer-servicer helper, window unit as he performed it [Dkt. 13; TR at 12-16].[11]  The Administrative Record supports the ALJ's findings that Plaintiff has residual functional capacity to perform light work in that he can lift and/or carry 20 pounds occasionally, lift and/or carry 10 pounds frequently, stand/walk for 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday, with the limitation that Plaintiff avoid extreme temperatures [TR at 12].  Plaintiff's past work, as noted by Ms. Kamarov, consisted of a number of occupations performed at a light or higher exertion level in the national economy, or as performed by Plaintiff.  *Id*. at 49-53.  The ALJ, consistent with Plaintiff's medical records and testimony reflecting an eighteen to twenty year history of diabetes mellitus type II, diabetes medication side effects of fatigue, and plaintiffs reported limited activities of daily living, set Plaintiff's residual functional capacity exertion level at light. *Id*. at 12-16, 282-356.  Further, the ALJ included a temperature limitation, consistent with Plaintiff's testimony that extreme heat aggravates his symptoms.  *Id*. at 12-16, 35-48, 282-356.

---

[11]  The Court acknowledges that the ALJ departed from the exertion level of heavy set forth in the DOT for air-conditioning installer-servicer helper, window unit [TR at 12-16].  637.687-010 AIR-CONDITIONING INSTALLER-SERVICER HELPER, WINDOW UNIT, DICOT 637.687-010.  The ALJ may take notice of the exertion level of a particular job as set forth in the DOT and as actually performed by the individual. *Jones v. Bowen,* 829 F.2d 524, 527 n. 2  (5th Cir.1987); *Villa,* 895 F.2d at 1022-23.  Here, the ALJ's conclusion that the position of air-conditioning installer-servicer helper, window unit, as performed by Plaintiff, was performed at the light exertion level is supported by the vocational expert, Ms. Kamarov's testimony at Hearing and by the record, which reflects Plaintiff carried boxes weighing no more than ten pounds, while performing the work of an air-conditioning installer-servicer helper, window unit [TR at 12-16, 49-50, 212].  *See* 20 C.F.R. § 404.1567 (stating light work involves lifting no more than twenty pounds and ten pounds frequently, while heavy work involves lifting up to one hundred pounds and fifty pounds frequently). Neither Plaintiff nor Commissioner have raised the exertion level finding as an issue on appeal [Dkts. 13; 16].

However, as to the additional limitations Plaintiff asserts the ALJ should have included, related to standing, walking, gripping, and handling, these limitations relate not to Plaintiff's diabetes mellitus, but to Plaintiff's peripheral neuropathy impairment. [Dkt. 13 at 3-4; TR at 282-356]. The ALJ identifies that no physician has found Plaintiff's peripheral neuropathy physical symptoms to be severe enough to order additional diagnostic testing or recommend physical limitations [*see generally* TR at 282-356]. Indeed, the MCMK Records, the CHM Records, and the PrimaCare Records, reflecting foot and outer extremity examinations on Plaintiff, all indicate normal foot and hand function. *Id*. at 283-84, 291, 296-301, 309-14, 341-45. The State Agency Assessments reflect the same. *Id*. at 302-05.

Further, the ALJ notes that Plaintiff's medical treatment frequency and type of treatment received are inconsistent with the severe peripheral neuropathy symptomology and significant standing, walking, gripping, and handling limitations requested by Plaintiff [Dkt. 13 at 2-4]. The medical records reflect sporadic medical visits separated by months, and no hospitalizations or emergent treatment related to Plaintiff's peripheral neuropathy [TR at 282-356]. For example, the PrimaCare Records from 2012 and 2013 indicate three month, eight month, and two month gaps, respectively, between appointments. *Id*. at 291, 296-301, 309-14, 318-19, 347-51. Emergent treatment of Plaintiff, where it did occur, was unrelated to Plaintiff's diabetes and peripheral neuropathy (e.g. the flu and ear infections) and/or was accompanied by reports of non-compliance with prescribed treatment or was a natural complication resulting from non-compliance (e.g. ulcers and scales). *Id*. at 287, 289 (inflammation of the ear), 318-19 (flu), 341-45 (ulcer of the neck), 347-51 (ear pain and fatigue), 352-53 (ulcers and scales of the feet). The frequent reports of non-compliance with treatment raise a presumption that Plaintiff's symptoms are less severe than reported by Plaintiff and/or can be controlled by treatment.

*Id*. at 283-89, 291, 296-301, 309-14, 341-45; *Villa*, 895 F.2d at 1024 (finding non-compliance with treatment, or lack of treatment indicative of absence of disability). Additionally, the MCMK Records, CHM Records, and PrimaCare Records reflect only two types of treatment related to Plaintiff's diabetes and peripheral neuropathy: (1) medication; and (2) treatment of natural complications arising from diabetes (e.g. ulcers) [TR at 282-356]. Plaintiff never found his symptoms severe enough to seek treatment from a diabetes specialist such as an endocrinologist, although one was recommended. *Id*. at 309-14. Plaintiff also did not find his symptoms to be of a severity level to request more regular care appointments or to seek emergency room or urgent care treatment for emergent symptoms. *See id*. at 282-356. Generally, Plaintiff's medical history reflects routine medication treatment for type II diabetes with no unusual treatments or severe symptoms. *Id*. Plaintiff's diabetes and/or peripheral neuropathy do not give rise to residual functional limitations, if they can be controlled by routine medication or other treatment. *Johnson*, 864 F.2d at 348 (finding that plaintiff's depression was not an impairment and thus not disabling because it could be controlled by medication). Plaintiff's self-reported daily activities also reflect Plaintiff is able to complete routine personal hygiene and household tasks such as gardening and grocery shopping [TR at 30-34, 45-47, 226-32, 257-64]. Thus, Plaintiff's medical history and daily activities are inconsistent with the additional functional limitations requested and do not support the severe symptoms Plaintiff argues exist. *Id*. at 30-48, 226-32, 257-64, 282-356.

The Court acknowledges Plaintiff's argument that the lack of medical evidence (such as frequent medical appointments and extensive treatment) supporting severity of Plaintiff's symptoms is due to and/or is the result of Plaintiff's difficulties affording treatment and lack of insurance, and does not reflect the true severity of Plaintiff's symptoms [Dkt. 13 at 4-5;

TR at 12-16, 32, 42-48].  However, the ALJ's determination specifically addressed Plaintiff's alleged lack of financial means, and found that it was unsubstantiated by documentation reflecting inability to pay or efforts to seek financial assistance for medical treatment or low cost care [TR at 12-14; *see generally* TR at 282-356].  *Villa*, 895 F.2d at 1024 (finding lack of treatment can be considered in the disability analysis particularly where the only evidence of severity of an impairment is the plaintiff's testimony).[12]  The record simply is devoid of medical evidence supporting standing, walking, gripping, and handling limitations and/or evidence of Plaintiff's financial hardship, except for Plaintiff's subjective testimony, which the ALJ found to not be credible (discussed *infra*).  The Court declines to reverse the ALJ's factual determinations, where, as here, the ALJ considered the record before him or her and found it devoid of evidence corroborating the plaintiff's testimony.  *Teague*, 2008 WL 5101717, at *3; *Steimer*, 395 F.2d at 198.

The Court therefore finds that there is substantial evidence in the record to support the ALJ's residual functional capacity determination, including all limitations incorporated and/or excluded.  *Hames*, 707 F.2d at 164.  There is a lack of substantial evidence, other than Plaintiff's own testimony, to support any additional residual functional capacity limitations.  *Id.*[13]

---

[12] *See supra* note 2 and accompanying text.

[13] Because this Court finds that the ALJ's determination at step four is supported by substantial evidence, the Court does not reach Plaintiff's arguments regarding his residual functional capacity to engage in other work available in the national economy.  *Leggett*, 67 F.3d at 564 (explaining sequential analysis terminates if at any step ALJ finds individual is not disabled).

**CONCLUSION**

The Court concludes that the Appeals Council did not err in upholding the ALJ's decision that Plaintiff is not disabled. Pursuant to the foregoing, the decision of the Commissioner is **AFFIRMED**.

**SIGNED this 5th day of May, 2016.**

_____
Christine A. Nowak
UNITED STATES MAGISTRATE JUDGE